**FOREST CITY DALY HOUSING, INC.,** d/b/a Four Corners Development, and "John Does," Plaintiffs–Appellants,

v.

**TOWN OF NORTH HEMPSTEAD,** Town of North Hempstead Building Department, Donald Alberto, Commissioner of Buildings, and Town of North Hempstead Board of Zoning Appeals, Defendants–Appellees.

Docket No. 98–7881

United States Court of Appeals, Second Circuit.

Argued March 15, 1999.

Decided April 16, 1999.

Robert B. Hirsch, Arent Fox Kintner Plotkin & Kahn, New York, N.Y. (David N. Wynn and Michael S. Cryan, of counsel), for Plaintiffs–Appellants.

Robert S. Smith, Paul, Weiss, Rifkind, Wharton & Garrison, New York, N.Y. (Holly D. Jarmul, Paul, Weiss, Rifkind,

Wharton & Garrison, and Howard S. Miller, Town Attorney for Town of North Hempstead, of Counsel), for Defendants–Appellees.

Before: WALKER and CABRANES, Circuit Judges, and TSOUCALAS,[*] Judge, Court of Int'l Trade.

JOSÉ A. CABRANES, Circuit Judge:

We consider here whether, in the circumstances presented, federal antidiscrimination statutes require a municipality to make accommodations in order to permit construction of an "assisted living facility"—a facility designed to provide care, in a residential environment, for individuals with certain disabilities—on land zoned for commercial uses only. We conclude that such accommodations are not required unless it can be shown that, notwithstanding the commercial zoning, building permits would be granted for comparable "traditional" residences—that is, residences in which persons *without* disabilities can live—in the relevant area. Because plaintiffs in this case have not demonstrated that they are likely to make such a showing, we affirm the order of the United States District Court for the Eastern District of New York (Joanna Seybert, *Judge*) denying their motion for a preliminary injunction against the municipality's interference with construction of their assisted living facility.

## I. BACKGROUND

Plaintiff Forest City Daly Housing, Inc., doing business as Four Corners Development ("Four Corners") is the developer of the proposed assisted living facility (the "Facility"), which is designed for individuals—primarily the aged—who require regular assistance with daily activities, but not skilled nursing care. The Facility would consist of 72 individual units, which are designed to create a home-like atmosphere

* The Honorable Nicholas Tsoucalas, of the United States Court of International Trade, sitting by designation.

but differ from traditional apartments or condominium units in that they are relatively small (300 to 600 square feet) and lack full kitchens. The Facility also would include a commercial kitchen for preparation of three daily meals, and common areas that are more expansive than those in most residential buildings. The exterior of the Facility is designed to appear residential, but the proposal calls for only one off-street parking space for every two units. A full-time staff would provide around-the-clock assistance with activities such as bathing, dressing, toileting, and eating, but skilled nursing care would not be provided. Although the Facility would impose no age or disability restrictions, studies in the record show that the "typical" resident of an assisted living facility is over 80 years old and requires assistance in one or more of these activities.

Four Corners seeks to build the Facility on a site at 320–334 Main Street in Port Washington, New York (the "Site"), which is within the Town of North Hempstead (the "Town"). Across Main Street from the Site is Long Island Sound, the town dock, and Sunset Park, which is a waterfront recreation area with ballfields and a concert shell. Four Corners obtained options to purchase the six parcels of real property that comprise the Site. The existing buildings on those parcels currently are used by various businesses, including an insurance office, a consignment shop, a cabinetmaker, a towing service, and an automobile repair shop.

Under the Town's zoning ordinance, enacted by the Town Board pursuant to N.Y. Town Law § 261, the front of the Site is zoned "Business B" from Main Street back to a depth of 100 feet, and the rear of the Site is zoned "Residence C." Nursing homes, but not ordinary residences, are among the uses specifically permitted in Business B zones. Throughout these proceedings, the parties appear to have agreed that the Facility is permissible in

the Residence C zone, but that it is neither a "nursing home" (which is characterized primarily by the availability of skilled nursing care) nor any other type of use permitted in the Business B zone.

At least two procedures exist through which a use might be permitted in a given area despite the fact that it is not among those uses listed by the zoning ordinance for the applicable zone. First, the Town's Board of Zoning and Appeals (the "BZA"), which was established by the Town Board [1] pursuant to the requirements of N.Y. Town Law § 267, may "vary the application of th[e zoning] ordinance and authorize the issuance of permits in harmony with the general purpose and intent" thereof. North Hempstead Code § 70–225.A. In particular, "[a]ny use of the same general character as any of the uses ... specifically permitted may be authorized by the Board of Zoning and Appeals after a public hearing." *Id.* § 70–140. Second, the Town Board itself may, by adopting an amendment to the zoning ordinance, rezone a certain parcel to a zoning classification in which the requested use is specifically permitted. *See* N.Y. Town Law § 264 (governing the procedures for adoption of zoning ordinances and amendments thereto).

The record reflects that the latter procedure—for rezoning—has been followed on several occasions. Most importantly, the Town Board in 1980 rezoned a parcel at 372 Main Street, within 500 feet of the Site, from Business B and Residence C to "Golden Age Residence District." Permitted uses in the Golden Age Residence District are limited to "[a] multiple-residence dwelling or dwellings specifically designed for use and tenancy by senior citizens," and "[a]ccessory buildings" serving such dwellings. North Hempstead Code § 70–90. Similar rezonings allowed residential uses on two parcels in Albertson and Manhasset, which—like Port Washington—are unincorporated areas within the Town of

---

**1.** The Town Board is distinct from the BZA. The Town Board appoints the members of the BZA, but the membership of the two boards may not overlap. *See* N.Y. Town Law § 267.

North Hempstead. By contrast to these examples of rezoning, there is no evidence that the mechanism of a special use permit has ever been used to authorize residential uses in a Business B zone.

Nevertheless, rather than seek rezoning by the Town Board, Four Corners applied for a special use permit from the BZA on the theory that the Facility would be "of the same general character," North Hempstead Code § 70-140, as a nursing home, which—as noted above—is a permitted use in the Business B zone. During the spring of 1997, Town officials held an introductory meeting with representatives of Four Corners for the purpose of discussing the various options for seeking a building permit. According to the preliminary injunction hearing testimony of Michael Levine, who at the time of the meeting was an assistant to the Town's Commissioner of Planning and Economic Development, the zoning counsel for Four Corners indicated that the choice to seek a special use permit was based on a desire to avoid the unit-per-acre density limitations for Golden Age Residence Districts and other residential zones.[2]

In April 1997, Four Corners filed an application for a building permit with the Town of North Hempstead Building Department, which is responsible for determining whether or not a proposed building plan is permissible within the existing zoning code. The Building Department's Notice of Disapproval, as amended on June 25, 1997, stated that the building plan failed to comply with the Town's zoning ordinance in five areas, only two of which are at issue in this case. First, the Building Department determined that, of the uses permitted within a Business B zone, the Facility was most similar to a nursing home. The Building Department concluded that the Facility was not actually a nursing home, and thus that a permit could not be granted; however, the Facility "appeared similar enough [to a nursing home] to send [the application] to the Zoning Board" for consideration of whether a special use permit should be granted. Second, the building plan for the Facility included only 36 parking spaces, rather than the 56 spaces required for a nursing home with the same number of beds.

Four Corners appealed to the BZA, seeking, *inter alia*, a special use permit and a parking variance.[3] After the required public hearing, the BZA denied the requested relief in a 26 page written decision. With respect to the special use permit, the BZA reasoned that, in light of the absence of skilled nursing care, the residential character of the individual units, and the potential for relatively healthy residents, the Facility would not be "of the same general character as" a nursing home. Instead, the BZA concluded that "[t]he structure of the proposed facility ... is that of an apartment house with specialized services, not a nursing home." With respect to the parking variance, the BZA found that 36 spaces would be inadequate to support automobiles parked by Facility employees, any privately employed aides, and the residents themselves;

2. Levine testified:
 We ... inquired as to whether they were seeking a rezoning—perhaps to golden age. Mr. Mineo [the zoning counsel] responded that he had looked at that option and that he couldn't get the density he needed ... under a golden age rezoning. Mr. Mineo informed us of the [zoning ordinance provision] concerning similar and like uses to a nursing home in a business B district. And he informed us of his intent to try his luck was his quote with the Zoning Board [*i.e.,* the BZA] to see if that approach would work.

 We did not suggest or recommend that alternative to him. We did acknowledge it might be faster than seeking a rezoning, but it was Mr. Mineo's decision to go that route.

3. The zoning ordinance authorizes the BZA to "[v]ary any provision of this ordinance in cases of practical difficulty or unnecessary hardship, provided public health, safety and welfare are secured." North Hempstead Code § 70-225.I.

because the Facility did not intend to restrict automobile ownership by residents, the BZA rejected the developer's assertion that few or no residents would use the spaces provided.

In March 1998, Four Corners—acting on behalf of itself and an undefined number of "John Does," described as unidentified future residents of the Facility—filed suit against the Town, the Building Department, Buildings Commissioner Donald Alberto, and the BZA. The complaint alleges that defendants violated the Americans with Disabilities Act (the "ADA"), 42 U.S.C. § 12101 *et seq.,* the Rehabilitation Act of 1973, 29 U.S.C. § 794, and the Fair Housing Act (the "FHA"), as amended by the Fair Housing Amendments Act of 1988, 42 U.S.C. §§ 3601–3631, through discriminatory conduct that included the failure to reasonably accommodate the needs of disabled prospective residents of the Facility.

Plaintiffs moved for a preliminary injunction, and Judge Seybert referred the matter to Magistrate Judge Viktor V. Pohorelsky, who conducted an evidentiary hearing over the course of several days and recommended denial of the motion. Adopting Judge Pohorelsky's report and recommendation in part, Judge Seybert denied the motion for a preliminary injunction. She concluded that plaintiffs had failed to establish a likelihood of success on the merits of their claims, because they had failed to show any evidence of a discriminatory motive or animus towards the disabled, and because reasonable accommodations were not required where persons without disabilities did not have housing opportunities analogous to those sought by plaintiffs. Judge Seybert also concluded that plaintiffs "ha[d] failed to establish the requisite irreparable harm to secure a preliminary injunction."

Plaintiffs timely appealed, pursuant to 28 U.S.C. § 1292(a)(1),[4] the district court's interlocutory order denying their motion.

## II. DISCUSSION

 We review the denial of a preliminary injunction for abuse of discretion. *See Charette v. Town of Oyster Bay,* 159 F.3d 749, 755 (2d Cir.1998). "Either an error of law or a clear error of fact may constitute an abuse of discretion." *Id.* In this case, a threshold consideration is whether the district court analyzed the motion under the correct standard.

### A. *Showing Required for Preliminary Injunction*

 In most cases, a party seeking a preliminary injunction must demonstrate (1) that it will be irreparably harmed in the absence of an injunction, and (2) either (a) a likelihood of success on the merits or (b) sufficiently serious questions going to the merits of the case to make them a fair ground for litigation, and a balance of hardships tipping decidedly in its favor. *See, e.g., Genesee Brewing Co. v. Stroh Brewing Co.,* 124 F.3d 137, 142 (2d Cir. 1997). One exception to the ordinary standard is that, where a preliminary injunction is sought against government action taken in the public interest pursuant to a statutory or regulatory scheme, the less-demanding "fair ground for litigation" standard is inapplicable, and therefore a "likelihood of success" must be shown. *See International Dairy Foods Ass'n v. Amestoy,* 92 F.3d 67, 70 (2d Cir.1996). This higher standard reflects judicial deference toward "legislation or regulations developed through presumptively reasoned democratic processes." *Able v. United States,* 44 F.3d 128, 131 (2d Cir.1995) (per curiam). An even more rigorous standard—requiring a "clear" or "substantial"

---

4. The statute provides, in pertinent part:
 [T]he courts of appeals shall have jurisdiction of appeals from:
 (1) Interlocutory orders of the district courts of the United States ... granting,

continuing, modifying, refusing or dissolving injunctions, or refusing to dissolve or modify injunctions, except where a direct review may be had in the Supreme Court[.]
28 U.S.C. § 1292(a)(1).

showing of likelihood of success—applies where "(i) an injunction will alter, rather than maintain, the status quo, or (ii) an injunction will provide the movant with substantially all the relief sought and that relief cannot be undone even if the defendant prevails at a trial on the merits." *Tom Doherty Assocs. v. Saban Ent., Inc.,* 60 F.3d 27, 33–34 (2d Cir.1995).

■ Plaintiffs contend that the "regulatory scheme" exception should not apply to this case, because federal disability statutes, with their requirement of "reasonable accommodations," are designed to prevent rigid enforcement of even presumptively valid governmental rules.[5] We need not reach this issue, however, because we would require a "clear" or "substantial" showing of likelihood of success on the merits whether or not the exception were applicable. The preliminary injunction sought by plaintiffs in this case would lead to significant and essentially irreversible alterations to the status quo. Specifically, plaintiffs maintain that a preliminary injunction is necessary to prevent delays in occupation of the Facility—that is, to allow the demolition of existing structures at the Site and the construction of the

Facility to proceed during the pendency of this litigation.[6] Under these circumstances, the district court did not err by requiring plaintiffs to demonstrate, in addition to irreparable harm, at least a "likelihood of success" on the merits.

## B. Likelihood of Success

As noted above, plaintiffs assert claims under three federal statutes: the FHA, the ADA, and the Rehabilitation Act. The FHA makes it unlawful "[t]o discriminate in the sale or rental, or to otherwise make unavailable or deny, a dwelling to any buyer or renter because of a handicap," 42 U.S.C. § 3604(f)(1), and the statute defines discrimination to include "a refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling," 42 U.S.C. § 3604(f)(3)(B). Similarly, the ADA and the Rehabilitation Act prohibit all disability-based discrimination by a public entity or recipient of federal financial assistance,[7] and these statutes require reasonable accommodations that are necessary for an equal opportunity to receive benefits from,

---

5. In a recent case involving a challenge to a zoning decision similar to the one at issue here, we found it unnecessary to decide whether the "regulatory scheme" exception applied, because we agreed with the district court's conclusion that a preliminary injunction was appropriate even under the "likelihood of success" standard. *See Innovative Health Sys., Inc. v. City of White Plains,* 117 F.3d 37, 43 n. 6 (2d Cir.1997).

6. We previously have stated that a preliminary injunction against enforcement of a zoning ordinance could itself be considered either mandatory (altering the status quo) or prohibitory (maintaining the status quo), given that the distinction between the two "is often more semantical than substantive." *Innovative Health,* 117 F.3d at 43 (internal quotation marks omitted). As noted above, however, we did not need to decide in that case whether to apply a standard lower than "likelihood of success." *See id.* at 43 & n. 6. In any event, the requested injunction in that case would have permitted an *existing* build-

ing to be used for outpatient treatment of drug and alcohol addicts. *See id.* at 40–41. If defendants in that case ultimately prevailed, therefore, the treatment center presumably could have been required to cease operations in that building, thereby restoring the status quo prior to the injunction.

7. The ADA provides, in pertinent part:

[N]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.

42 U.S.C. § 12132. Similarly, the Rehabilitation Act provides:

No otherwise qualified individual with a disability ... shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance....

29 U.S.C. § 794(a).

or participate in, programs run by such entities.[8]

■ All three statutes apply to municipal zoning decisions. *See Innovative Health,* 117 F.3d at 44–46 (ADA and Rehabilitation Act); *Huntington Branch, NAACP v. Town of Huntington,* 844 F.2d 926, 936–37 (2d Cir.), *aff'd,* 488 U.S. 15, 109 S.Ct. 276, 102 L.Ed.2d 180 (1988) (FHA). At the preliminary injunction stage, plaintiffs need to show a likelihood of success with respect to only one of these statutes. Plaintiffs, however, do not contend that their claim under any one statute differs from their claim under the others; accordingly, we will analyze the three claims together.

At the outset, we note that the district court did not err by assuming that some, if not all, residents of the Facility would suffer from a disability, in that they would have "a physical or mental impairment" that "substantially limits" one or more "major life activities" such as bathing, dressing, toileting, and eating. *See* 29 U.S.C. § 705(20)(B)(i) (Rehabilitation Act); 42 U.S.C. § 3602(h)(1)(FHA); *id.* § 12102(2)(A)(ADA). Moreover, plaintiffs do not challenge the district court's findings that they failed to demonstrate a likelihood of success on their claim that defendants engaged in intentional discrimination based on the future residents' disabilities. Instead, plaintiffs challenge the district court's conclusion that they failed to demonstrate a likelihood of success on their claim that defendants failed to reasonably accommodate these disabilities.

As stated above, the district court found that reasonable accommodations were not necessary to afford prospective residents an equal housing opportunity, because persons without disabilities do not have opportunities analogous to those being sought here. This issue does not arise in the usual zoning case, where sponsors of a proposed residence or facility for disabled persons seek a variance from use restrictions in a *residential* zone, based upon the asserted need of the individuals, because of their disabilities, to live in non-traditional settings. *See, e.g., Bryant Woods Inn, Inc. v. Howard County,* 124 F.3d 597 (4th Cir.1997) (use variance allowing group home for disabled in single-family residential zone, based upon need of disabled persons to share care-givers and homemaking responsibilities); *Smith & Lee Assocs. v. City of Taylor,* 102 F.3d 781 (6th Cir.1996) (same); *Elderhaven, Inc. v. City of Lubbock,* 98 F.3d 175 (5th Cir.1996) (same); *Erdman v. City of Fort Atkinson,* 84 F.3d 960 (7th Cir.1996) (same); *Oxford House–C v. City of Saint Louis,* 77 F.3d 249 (8th Cir.1996) (same); *Hovsons, Inc. v. Township of Brick,* 89 F.3d 1096 (3d Cir.1996) (use variance allowing nursing home in residential zone); *Assisted Living Assocs. of Moorestown, L.L.C. v. Moorestown Township,* 996 F.Supp. 409 (D.N.J.1998) (exemption allowing assisted living facility in residential zone). It is implicit in these cases that persons without disabilities have the opportunity to live in the neighbor-

---

**8.** The ADA defines the term "qualified individual with a disability" as

> an individual with a disability who, with or without reasonable modifications to rules, policies, or practices, ... meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity.

42 U.S.C. § 12131(2). With respect to the Rehabilitation Act, we have noted:

> Although no statutory provision or regulation speaks directly of reasonable accommodations under Title I of the Rehabilitation Act, the Supreme Court has ruled that eligibility for a federally assisted benefit

> "cannot be defined in a way that effectively denies otherwise qualified handicapped individuals the meaningful access to which they are entitled; to assure meaningful access, reasonable accommodations in the grantee's program or benefit may have to be made."

*Doe v. Pfrommer,* 148 F.3d 73, 82–83 (2d Cir.1998) (quoting *Alexander v. Choate,* 469 U.S. 287, 301, 105 S.Ct. 712, 83 L.Ed.2d 661 (1985)); *accord Bartlett v. New York State Bd. of Law Examiners,* 156 F.3d 321, 329 (2d Cir.1998) (disabled persons entitled to reasonable accommodations under ADA and Rehabilitation Act).

hoods at issue in, for example, single-family homes that comply with the applicable zoning ordinance. The outcomes of these cases therefore turn upon whether the non-complying features of the proposed residence are "necessary" in light of the disabilities of proposed residents, and upon whether the accommodation of these differences is "reasonable."

■ In this case, however, Four Corners sought permission to locate the Facility in a Business B zone, where residential uses are not permitted. We agree with the district court that if a building permit would not be granted even for comparable "traditional" residences (that is, residences where persons without disabilities can live) in the relevant area, a municipality is not required to make accommodations that would facilitate a building permit for housing designed for the disabled. *Cf. Homeless Action Comm. v. City of Albany*, No. 97–CV–469, 1997 WL 792944, at *9–10 (N.D.N.Y. Oct.23, 1997) (no accommodation required because "neither handicapped nor non-handicapped individuals are allowed to establish residence within the purely commercial area"), *vacated per stipulation*, 1997 WL 876956 (N.D.N.Y. Dec.19, 1997).

■ Plaintiffs do not dispute this proposition, but they maintain that permits for "traditional" residential housing *are* available, as evidenced by the prior rezonings discussed above. Their primary argument on appeal is that the district court erred by focusing on the availability of a special use permit from the BZA, which Four Corners chose to seek instead of rezoning by the Town Board. The district court's conclusion—that no analogous housing opportunity exists for persons without disabilities—was based on the uncontested fact that a special use permit has never been granted to allow a residential use in a business zone.

We agree with plaintiffs that it may have been inappropriate for the district court to view the prior rezoning as irrelevant. If the Town Board routinely granted rezoning for residential development in a given area, then it could be argued that a housing "opportunity" in that area existed, and, in such circumstances, persons with disabilities would be entitled to reasonable accommodations that are necessary to provide an "equal opportunity." A developer's choice to seek such an "equal opportunity" through a different procedural mechanism—that is, an application for a special use permit rather than rezoning—does not necessarily indicate that disabled persons are asking for anything more than the "opportunity" that is available to non-disabled persons.

■ On the other hand, the fact of some rezoning in the past does not lead inevitably to the conclusion that a residential complex would have received a building permit at the time that the application for the Facility was denied.[9] To the contrary, the district court found that "the comments recorded at the public hearing [before the BZA] indicate that opposition would be raised against any residential structure of a large size constructed on the property." For example, the Facility's opponents stressed that the Town's 1989 Master Plan embodies a strong policy against "encroaching residential development" in the specific waterfront area of Port Washington where the Site is located.[10] Conversely, there is no evidence that

9. As noted above, this issue is dispositive, because if there were no concurrent housing opportunities for non-disabled individuals, then defendants were not required to make reasonable accommodations in order to create such opportunities for disabled persons.

10. A master plan, now known as a "town comprehensive plan," identifies "the goals, objectives, principles, guidelines, policies,

standards, devices and instruments for the immediate and long-range protection, enhancement, growth and development of the town." N.Y. Town Law § 272–a(2)(a). The Port Washington sections of the Master Plan quoted at the BZA hearing state:

*Lower Main Street*
* * *

the permit was denied because of characteristics of the Facility that made it different from a traditional residential complex. The avenue of zoning relief sought by Four Corners—that is, the special use permit—invited a comparison of the Facility not with a traditional residential complex, but rather with a nursing home.

On this record, it is unlikely that plaintiffs will succeed in showing that they were impermissibly denied a building permit because of defendants' failure to accommodate features of the Facility made necessary by the disabilities of prospective residents. And, as noted above, plaintiffs do not argue in this appeal that they were denied a building permit because of an intent by defendants to discriminate against persons with disabilities. Accordingly, we agree with the district court that plaintiffs have failed to demonstrate a likelihood of success on the merits of their claims.

### C. *Irreparable Harm*

■ Irreparable harm is "injury that is neither remote nor speculative, but actual and imminent and that cannot be remedied by an award of monetary damages." *Rodriguez v. DeBuono*, 162 F.3d 56, 61 (2d Cir.1998) (per curiam) (internal quotation marks omitted). In this case, the district court concluded that plaintiffs had not demonstrated that they would be irreparably harmed in the absence of an injunction. The district court found that any injury to Four Corners itself would be purely financial, and that the prospect of injury to unidentified future residents of the Facility is remote and speculative.

> Encroaching residential development is a potential threat to the existing waterfront/ commercial and recreational uses. Zoning to protect and stabilize these water-dependent uses will assist in preserving the commercial viability of Lower Main Street. Specifically, a waterfront/commercial zone that provides for warranted waterfront/commercial uses while at the same time encourages access and use of the water by the public (e.g., marinas, restaurants and the like) is appropriate.

On appeal, plaintiffs argue—apparently for the first time—that notwithstanding these findings, irreparable harm should be presumed to flow from housing discrimination. There is some support for the proposition that where a plaintiff demonstrates a likelihood of success on the merits of a fair housing claim, irreparable harm may be presumed. *See, e.g., Rogers v. Windmill Pointe Village Club Ass'n,* 967 F.2d 525, 528 (11th Cir.1992) (citing *Gresham v. Windrush Partners, Ltd.,* 730 F.2d 1417, 1423–24 (11th Cir.1984)); *Assisted Living Assocs.,* 996 F.Supp. at 438–39; *North Shore–Chicago Rehabilitation, Inc. v. Village of Skokie,* 827 F.Supp. 497, 509 (N.D.Ill.1993); *Stewart B. McKinney Found., Inc. v. Town Plan & Zoning Comm'n of Town of Fairfield,* 790 F.Supp. 1197, 1208 (D.Conn.1992); *see also* 42 U.S.C. § 3613(c)(1) (expressly authorizing an injunction "if the court finds that a discriminatory housing practice has occurred or is about to occur").

■ Because a likelihood of success has not been shown here, however, we need not decide whether a presumption of irreparable harm would otherwise apply. Whether presumed or not, any irreparable harm plaintiffs might suffer in this case does not warrant a preliminary injunction in the absence of a showing of (at least) a likelihood of success.

### III. CONCLUSION

Because reasonable accommodations are not required where comparable housing

> *Manhasset Bay Waterfront*
> ... Zoning near this waterfront area should be limited in terms of bulk and use categories. Intensive residential or other land uses should be limited to areas further east, away from the waterfront.
>
> The Master Plan was not yet in effect in 1980, when the Town Board rezoned a parcel in this waterfront area for residential use.

opportunities for persons without disabilities have not been shown to exist, we agree with the district court that plaintiffs have failed to demonstrate a likelihood of success on the merits. Accordingly, we conclude that the district court did not abuse its discretion when it denied plaintiffs' motion for a preliminary injunction. The district court's order is affirmed.